# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| S.T. Specialty Foods, Inc., <br><br> Plaintiff, <br><br> v. <br><br> Copesan Services Inc. and Wil-Kil Pest Control Company, Inc., <br><br> Defendants. | Civil No. 19-cv-0339 (NEB/HB) <br><br><br> **ORDER** |

HILDY BOWBEER, United States Magistrate Judge

Plaintiff S.T. Specialty Foods, Inc. ("S.T. Specialty") moves to compel Defendants[1] to fully respond to several discovery requests. For the reasons set forth below, the motion is granted in part and denied in part.

## I. Background

### A. Factual Background

S.T. Specialty, a food products manufacturer, arranged with Copesan to conduct a fumigation at S.T. Specialty's food processing facility in Brooklyn Park, Minnesota beginning on Friday, September 30, 2016. (Compl. ¶ 1 [Doc. No. 1].) S.T. Specialty alleges that Copesan used a pesticide that caused virtually all the mechanical equipment in the facility to fail, including manufacturing equipment, forklifts, printers, and

---

[1] Wil-Kil Pest Control is a wholly-owned subsidiary of Defendant Copesan Services, Inc. (Compl. ¶ 4 [Doc. No. 1].) Unless otherwise indicated, Defendants will be referred to herein collectively as "Copesan."

computer servers. (*Id.* ¶ 30.) S.T. Specialty discovered the damage on Monday, October 3, 2016, when its employees returned to work. (*Id.*) S.T. Specialty did not initially suspect the fumigant caused the damage, and began to investigate various possible causes, such as an electrical surge. (Hutchinson Decl. Ex. A [Doc. No. 28-1].)

On Monday, October 10, 2016—one week after the fumigation was completed— Ryko Cenin of S.T. Specialty called John Degner, the sales and service manager for Wil-Kil, to "ask some questions" about the fumigant Copesan used and its "potential of fine electrical damage." (Stellpflug Decl. Ex. 1 [Doc. No. 35 at 5].) Degner recounted his conversation with Cenin in an email to colleagues at Copesan, reporting that "[Cenin] is stating that they are running into some issues with some of their equipment and asked if it was fumigant related." (*Id.*)

On November 2, 2016, Rob Musiel, a manager at Copesan, called Diane Evans, a Senior Claim Examiner for Sedgwick Claims Management Services, a third-party claims manager for Copesan's insurer (hereafter "Sedgwick"), to put the insurer "on notice of S.T. Specialty's claim." (Evans Decl. ¶¶ 2, 5 [Doc. No. 34].) Musiel advised Evans that S.T. Specialty "was alleging that a fumigation provided at the S.T. Specialty Facility in Brooklyn Park, MN by representatives of Copesan and Wil-Kil over the weekend of September 30, 2016 had caused damage to equipment estimated to be over $100,000." (*Id.* ¶ 6.) Musiel further advised Evans that Copesan disagreed strongly with the allegation that the fumigation had caused the damage, "wished to defend against the claim" and intended "to put up an aggressive fight against these allegations." (*Id.* ¶¶ 7–9.)

On November 17, 2016, Thuan Moran, Senior Director of Operations for S.T. Specialty's parent company, wrote a formal letter to Copesan in which he stated S.T. Specialty had concluded that Copesan's fumigant had caused "widespread damage and loss," and that "[a]s the expert, Copesan was obligated to provide much clearer direction and oversight in terms of protecting ST's equipment." As a result, Moran stated, S.T. Specialty was seeking $515,955.42 to cover the loss. (Evans Decl. Ex. B [Doc. No. 34 at 8].) Copesan forwarded the letter to Sedgwick on or around December 2, and Evans began communicating directly with S.T. Specialty. (Evans Decl. ¶¶ 10–11.) In a telephone call with Moran on December 13, she learned that "only 'some' of the damaged equipment was still available to be inspected." As a result of that "loss of evidence," she thought "litigation would even more certainly ensue." *Id.*

On December 15, 2016, Evans had a telephone conversation with Sedgwick's regular counsel in Minnesota, Janet Stellpflug. Less than a week later, Evans hired a local claims adjuster, Stephen Kessler, who in turn, on December 22, retained Ryan Haase, a consulting engineer with expertise in metallurgy. (Evans Decl. ¶¶ 12–14.) Over the course of the next four months, Haase and others began working with S.T. Specialty to collect and test samples of the ruined electrical components. (Hutchinson Decl. Ex. D [Doc. No. 28-4 at 7–21].) It appears those interactions were cooperative. (*See* Hutchinson Decl. Ex. D (examples of communications between S.T. Specialty and Sedgwick representatives)). None of the communications from S.T. Specialty during this period appear to have explicitly threatened litigation, but Evans states that Haase and Kessler "were both hired … to defend the claims being made that were unsupported," and

that they were "aggressively defending and preparing for litigation by investigating and attempting to gather evidence." (Evans Decl. ¶ 15.)

In April of 2017, Copesan formally retained Stellpflug as outside counsel on the case. (Stellpflug Decl. ¶¶ 2–3.) She first contacted S.T. Specialty on behalf of Copesan on April 27, 2017. (Pl.'s Mem. Supp. at 9 [Doc. No. 27].) In September 2018, S.T. Specialty filed suit against Copesan. (Compl. [Doc. No. 1].)

### B. S.T. Specialty's Subpoenas to Kessler and Sedgwick

On July 22, 2019, S.T. Specialty served Stephen Kessler, Sedgwick's local claims adjuster, with a subpoena to testify and produce all documents related to his inspection of S.T. Specialty's facility. (Hutchinson Decl. Ex. G [Doc. No. 28-7].) A week later Copesan responded via letter to say that it did not object to Kessler's deposition, but that portions of his testimony and certain documents would be withheld on grounds of attorney-client privilege and/or work product. (Hutchinson Decl. Ex. H [Doc. No. 28-8].) S.T. Specialty later withdrew the request for Kessler's deposition but maintained its request for documents. ((Pl.'s Mem. Supp. at 20.) Kessler produced some documents (Stellpflug Decl. Exs. 4, 5). As of the date the motion was argued, Kessler had not himself served objections or a privilege log, nor had he moved to quash the subpoena, and Copesan's privilege log did not include a log of the documents that were withheld from Kessler's production, although it appeared likely there was significant overlap between the documents on Copesan's log and the documents withheld from Kessler's production. (*See* Pl.'s Mem. Supp. at 21; Hutchinson Decl. Ex. E [Doc. No. 28-5].)

In September or October 2019, S.T. Specialty served Sedgwick, through Evans, with a subpoena for all documents related to the investigation of the claimed damage at S.T. Specialty's facility.[2] (Hutchinson Decl. Ex. I [Doc. No. 28-9].) Attorney Stellpflug, on behalf of Copesan, served formal objections asserting both work product protection and attorney-client privilege. (Hutchinson Decl. Ex. J [Doc. No. 28-10].) Sedgwick did, however, produce approximately "500 pages of documents, almost all of which [S.T. Specialty] itself has already produced in this case." (Pl.'s Mem. Supp. at 21.) As with Kessler, Sedgwick did not separately serve objections to the subpoena or a privilege log, or move to quash the subpoena, but again, there appeared to be significant overlap between the documents on Copesan's log and the documents withheld by Sedgwick. (*See* Pl.'s Mem. Supp. at 21-22; Hutchinson Decl. Ex. E.)[3]

### C.      S.T. Specialty's Subpoena to Haase

On July 22, 2019, S.T. Specialty served Copesan's engineering consultant Ryan Haase with a subpoena seeking his deposition on September 6, 2019, and production of

---

[2]      The record is somewhat confused as to the date of service of the subpoena on Sedgwick. The Affidavit of Service states that Sedgwick was served via its registered agent, Corporation Service Company, on October 8, 2019. (Hutchinson Decl. Ex. I [Doc. No. 28-9 at 6].) Evans states the subpoena was served on September 30, 2019 or October 1, 2019. (Evans Decl. ¶ 16 [Doc. No. 34]; Evans Ex. C.) But the objections interposed by Copesan are dated September 27, 2019, and refer to a subpoena served on Evans on September 23. The Court surmises that the same subpoena was transmitted to Evans directly, perhaps more than once, prior to the formal service on CSC on October 8.

[3]      On January 2, 2020, in response to an inquiry by the Court about whether Kessler's and Sedgwick's documents were included on Copesan's log, Defendants' counsel, apparently for the first time, served (and, at the request of the Court, e-filed), separate privilege logs pertaining to Kessler's and Sedgwick's documents. [Doc. No. 39.]

all documents relating to his inspection of the S.T. Specialty facility and related analysis and testing of the equipment. (Hutchinson Decl. Ex. K [Doc. No. 28-11].) A week later Copesan served objections both to the deposition and to the demand for documents, asserting that Haase was a non-testifying consulting expert retained in anticipation of litigation under Federal Rule of Civil Procedure 26(b)(4)(D). (Hutchinson Decl. Ex. L [Doc. No. 28-12].) As Defendants' counsel made it clear Haase would not appear for the September 6 deposition, Plaintiff canceled the deposition (although it has not withdrawn the subpoena). Haase did not separately object, move to quash the subpoena, or produce a privilege log, and he has not produced any documents.

## II.    Discussion

S.T. Specialty filed the instant motion on November 4, 2019, seeking to compel production of documents that fall generally into three categories. First, S.T. Specialty seeks to discover documents in the possession of Copesan that were generated in the immediate aftermath of the fumigation and during the insurance claim investigation. Specifically, the documents sought by S.T. Specialty include documents Copesan withheld on work product grounds that were generated after Ryko Cenin's call to Copesan on October 10. 2016, and prior to April 27, 2017, when Stellpflug first contacted S.T. Specialty shortly after she was formally retained to represent Copesan in this matter.[4]  The documents include notes, timelines, emails, and reports. (Pl.'s Mem. Supp.

---

[4]      With one qualifier, S.T. Specialty agreed to forgo discovery of documents identified as work product and dated after April 27, 2017. (Pl.'s Mem. Supp. at 9–10). S.T. Specialty asked the Court, however, to require Copesan to clarify certain entries in its privilege log that "lack sufficient information to make an assessment of their work-

at 7–9; Def. Mem. Opp'n at 8; Hutchinson Decl. Ex. E [Doc. No. 28-5].) Copesan has produced some responsive documents, but has withheld a number of others on the ground that they were produced in anticipation of litigation and are therefore protected by the work product doctrine.

Second, S.T. Specialty moves to enforce the subpoenas it served on Sedgwick and Kessler to compel production of documents relating to their investigation and assessment of S.T. Specialty's claims. Finally, S.T. Specialty seeks to enforce the subpoena it served on Haase seeking information pertaining to Haase's inspection and testing of S.T. Specialty's equipment and his analysis of S.T. Specialty's claims.

As to all three categories of documents, S.T. Specialty contends that any documents generated at least prior to April 27, 2017, were not generated in anticipation of litigation and therefore were not properly withheld on work product grounds. In addition, S.T. Specialty contends that any objections to the Sedgwick, Kessler, and Haase subpoenas were waived because the subpoena recipients themselves did not object or move to quash the subpoenas, and Copesan did not have standing to interpose objections on their behalf.

Federal Rule of Civil Procedure 26(b)(3) delineates the scope of work product protection in the federal courts:

> Ordinarily, a party "may not discovery documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its

---

product and privilege claims." (Pl.'s Mem. Supp. at 33.) Copesan's counsel stated at the hearing that she would supplement the privilege log with the clarifying details S.T. Specialty sought. A supplemented Copesan privilege log was finally served (and, at the request of the Court, e-filed) on January 2, 2020. [Doc. No. 39.]

representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent).

Fed. R. Civ. P. 26(b)(3)(A). In addition, Rule 26(b)(4)(D) protects facts known or opinions held by an expert "who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial."

Thus, while work product is often that of an attorney, the work product doctrine is not confined to information or materials gathered or assembled by a lawyer, nor need it have been requested by an attorney or communicated by or to a client of an attorney. *Diversified Indus., Inc. v. Meredith,* 572 F.2d 596, 603 (8th Cir. 1977).

Moreover, work product protection may, and often does, begin before a lawsuit is actually filed. As Wright and Miller have said,

> Prudent parties anticipate litigation, and begin preparation prior to the time suit is formally commenced. Thus the test should be whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation. . . . But the converse of this is that even though litigation is already in prospect, there is no work-product immunity for documents prepared in the regular course of business rather than for purposes of the litigation.

8 Fed. Prac. & Pro. Civ. § 2024 (3d ed.); *see also Diversified Indus.,* 572 F.2d at 603.

Thus, the dispute raised by the present motion turns on whether "in light of the nature of the document and the factual situation in the particular case," the materials withheld "can fairly be said to have been prepared or obtained because of the prospect of litigation," rather than solely for an ordinary business purpose. *Simon v. G.D. Searle & Co.*, 816 F.2d 397, 401 (8th Cir. 1987) (cert. denied, 484 U.S. 917 (1987); *Banks v.*

*Wilson*, 151 F.R.D. 109, 112 (D. Minn. 1993). That is a fact-specific determination, and the burden of proof is on the party asserting the protection—here, Copesan. *Id.*

"The inchoate possibility, or even the likely chance of litigation," does not give rise to work product immunity. *Mission Nat'l Ins. Co. v. Lilly*, 112 F.R.D. 160, 163 (D. Minn. 1986); *see also Diversified Indus.,* 572 F.2d at 604 ("[T]he work product rule does not come into play merely because there is a remote prospect of future litigation."). On the other hand, "[t]he fact that litigation may still be a contingency at the time the document is prepared has not been held to render the privilege inapplicable, if the prospect of litigation is identifiable because of the specific claims that have already arisen." *McConnell v. Farmers Ins. Co., Inc.,* 2008 WL 510392 at *2 (W.D. Mo. 2008); *see also Fontaine v. Sunflower Beef Carrier, Inc.*, 87 F.R.D. 89, 93 (E.D. Mo. 1980) ("Though no suit had been filed, it was apparent who the plaintiff would likely be, and what the claims would likely concern.") The party seeking work product protection has the burden of proving that "at the very least some articulable claim, likely to lead to litigation, [has] arisen." *Coastal States Gas Corp. v. Dep't of Energy,* 617 F.2d 854, 865 (D.C. Cir. 1980).

This can be difficult to assess in cases involving the investigation and assessment of an insurer since "much of the paperwork generated by insurance companies is prepared with an eye toward a possible legal dispute over a claim." *Workman v. Cincinnati Ins. Co.*, No. 2:17-CV-00036 PLC, 2017 WL 6025999, at *4 (E.D. Mo. Dec. 5, 2017). "Because of this, it is important to distinguish between an investigative report developed in the ordinary course of business as a precaution for the remote

prospect of litigation and materials prepared *because* some articulable claim, likely to lead to litigation, . . . [has] arisen." *Id.* (cleaned up) (emphasis in original).

The Court notes, however, as did the court in *St. Paul Reinsurance Co. Ltd. v. Commercial Fin. Corp.*, 197 F.R.D. 620 (N.D. Iowa 2000), that the conclusions reached—and the language used—by courts on the question of whether documents arising out of an insurance investigation were generated in anticipation of litigation or merely for an ordinary business purpose seem to depend to a significant extent on whether the issue arises in the context of a first-party insurance claim (i.e., a coverage dispute) or a third-party claim, such as the case at bar. *Id.* at 635–36; *see also Goodyear Tire and Rubber Co. v. Chiles Power Supply, Inc.,* 190 F.R.D. 532, 536 (S.D. Ind. 1999). This distinction makes sense. An insurer must in the ordinary course of business examine whether coverage is available, yet it would only be after deciding to deny coverage that litigation could be said to be anything other than an "inchoate possibility." On the other hand, where a third party has made a demand for specific damages and has articulated a theory on which it alleges the insured is liable for those damages, it is more difficult to characterize the ensuing investigation by both the insured and the insurer as anything other than "because of the prospect of litigation"—even if litigation has not yet become a certainty.

The Court therefore arrives at the key questions posed by this motion: At what point did the prospect of litigation arise sufficiently to invoke work product protection under Rule 26(b)(3), and were the documents sought by this motion prepared "because of the prospect of litigation"? In making that assessment, the Court must be mindful of the

Eighth Circuit's admonition that "the work product doctrine is to be applied in a commonsense manner in light of reason and experience as determined on a case-by-case basis." *Pittman v. Frazer*, 129 F.3d 983, 988 (8th Cir. 1997). Copesan argues the answers must be derived by reference to Copesan's own subjective perceptions. (Def. Mem. Opp'n. at 9 [Doc. No. 33].) But the Court does not find support in the case law for a purely subjective standard, i.e., one that is satisfied so long as the party asserting the protection swears it was anticipating litigation on thus-and-such a date. At the same time, the Court is not persuaded that it is dispositive of the matter that S.T. Specialty deferred filing litigation in the hope that Copesan would simply concede liability and write a check for more than $500,000. Indeed, work product protection may arise even when there has been no *explicit* threat of litigation so long as the prospect of litigation is "identifiable because of specific claims that have already arisen." *McConnell v. Farmers Ins. Co., Inc.*, 2008 WL 510392, at *2 (W.D. Mo. 2008). Rather, courts examine objective evidence, such as the "factual situation" and the "nature of the documents" to determine whether a document "can fairly be said to have been prepared or obtained because of the prospect of litigation." *Simon*, 816 F.2d at 401 (citing Wright and Miller).

S.T. Specialty proposes the date on which Stellpflug, Copesan's outside counsel, first contacted S.T. Specialty, April 27, 2017, as an objective indicator that Copesan's conduct moving forward was in anticipation of litigation. Copesan argues for a much earlier date: October 10, 2016, the day when S.T. Specialty first contacted Copesan about the damage and asked questions about the fumigant Copesan used. In the absence of an explicit threat of litigation (which both parties acknowledge did not occur until this suit

11

was filed), the Court looks for objective indicia of anticipation and preparation for litigation, as opposed to the actions any responsible business would ordinarily take upon hearing of a dissatisfied customer looking for answers about why its equipment was damaged in the wake of services rendered.

Viewed in that light, the Court finds Copesan's suggested trigger date of October 10, 2016, to be too early. Copesan's notes from that call do not reveal that litigation was already on the horizon. Indeed, just the opposite. Its employee's notes reflect a phone call that was conducted with an inquisitive, concerned tenor, not a hostile or adversarial one. It opens, "I just had Ryco from S.T. call and ask some questions about the product we used and the potential of fine electrical damage. He is stating that they are running into some issues with some of their equipment and asked if it was fumigant related. . . ." (Evans Decl. Ex. 1.) Even from Copesan's perspective, the notes of the call do not foreshadow litigation. Moreover, Copesan did not notify its insurance carrier of S.T. Specialty's damage until nearly a month later, on November 2, 2016. (Evans Decl. ¶ 5.) It is hard to imagine that Copesan's actions at this juncture were "because of the prospect of litigation" when it had not even put its insurance carrier on notice. And even though Copesan insists its subjective intentions are central to the inquiry, there is no declaration from Copesan regarding its anticipation of litigation during this period. Even on November 2, when Copesan called Evans and "placed [Sedgwick] on notice of S.T. Specialty's claim," Evans's notes from the call state that "as of now, the customer hasn't made a claim." Furthermore, although Evans states conclusorily in her declaration that "[a]s soon as [she] was assigned to this matter, all

actions taken on behalf of Copesan and Wil-Kil were in anticipation of litigation" (Evans Decl. ¶ 3), nothing in the record indicates that S.T. Specialty had communicated anything further between October 10 and mid-November that would bring the prospect of litigation into Copesan's near view.

But the tenor of the interactions between S.T. Specialty and Copesan did shift on November 17, 2016, when Thuan Moran, S.T. Specialty's parent company's Senior Director of Operations, sent a formal letter to Copesan. The letter laid out S.T. Specialty's view of the interactions between S.T. Specialty and Copesan leading up to the fumigation, including Copesan's choice of fumigant chemical, the warnings Copesan gave and failed to give, and the precautions it took and failed to take. (Hutchinson Decl. Ex. C [Doc. No. 28-3].) It also stated S.T. Specialty's position that "[a]s a result of Copesan's use of the Fumi-Strip product, ST incurred widespread damage and loss to the Facility and has incurred substantial costs." (*Id.*) The letter closed with a demand for $515,955.42 from Copesan "due to the damage and loss sustained by ST regarding the fumigation by Copesan using the Fumi-Strip product." (*Id.*) The letter did not ask for Copesan's perspective on or response to S.T. Specialty's claims, but simply stated that Copesan should contact S.T. Specialty "so we can work through these issues *and finalize payment terms.*" (*Id.*) (emphasis added). The letter was subsequently forwarded to Evans, and Kessler and Haase were retained shortly thereafter.

S.T. Specialty argues that this activity is nothing more than the activity of an insurance company operating in the ordinary course of business when investigating a potential claim. But the question is not whether Sedgwick was doing what it was

obligated to do on behalf of an insured—it obviously was. The question is whether its actions, and those of its insured and its consultant during this same period, were taken because of the prospect of litigation against Copesan. It is here that the distinction between the first-party insurance cases (where the insurer is considering whether or not to provide coverage to its insured and therefore has not yet decided whether it will be adverse to its insured) and third-party cases (where the insured and the insurer are reacting not to the "remote possibility" of litigation, but to a "specific" "articulable" claim as a result of which they take steps to prepare to defend the litigation that may come) becomes relevant.[5]

This case falls into the latter category. It is thus different from *Mission National,* in which Magistrate Judge Symchych found that a law firm hired by the insurer was performing the "pure, ordinary business function" of the insurer to investigate a fire prior to determining whether it would cover the resulting damage to its insured. 112 F.R.D. at 162. Rather, the Court finds this case to be more analogous to *Banks v. Wilson*. In *Banks*, Magistrate Judge Erickson found that where the plaintiff had "placed the Defendant's insurer on notice that they were alleging that their injuries and losses had resulted from the Defendant's fault," there was no doubt that the statement taken of the

---

[5]     S.T. Specialty points out that under the terms of its contract with Copesan it is considered an "additional insured" under Copesan's liability insurance with Sedgwick. (Pl.'s Mem. Supp. at 14–15].) This is an interesting point, but there is no evidence that it was made to Copesan or Sedgwick during the investigation. In fact, nothing in the record indicates Sedgwick was acting in any capacity other than as a liability carrier investigating a claim *against* its insured (Copesan), not *by* an additional insured (such as S.T. Specialty).

defendant by his insurer was taken for the purpose of anticipated litigation.  151 F.R.D. at 112.  In this case, the November 17, 2016, letter from S.T. Specialty to Copesan laid out an articulable theory for a legal claim.  It marked a change in S.T. Specialty's approach to the matter that, the Court concludes, triggered a change in Copesan's posture as well.

This case is also distinguishable from cases like *Diversified Industries*, cited by S.T. Specialty, in which a company conducts an investigation for the purpose of assessing its business practices or its business risks generally, not because of the prospect of litigation.  In *Diversified Industries* the Eighth Circuit concluded that an investigation by a law firm into the company's employment practices was not protected by the work product doctrine because it was not prompted by the prospect of specific litigation.  *Diversified Industries,* 572 F.2d at 603–04.  Here, by contrast, "it was apparent who the plaintiff would likely be, and what the claims would likely concern." *Fontaine*, 87 F.R.D. at 93.

S.T. Specialty argues that it and Copesan/Sedgwick worked cooperatively to set up the inspection of the facility and equipment, and that even after Sedgwick formally retained Stellpflug as outside counsel for Copesan in April 2017, Stellpflug and S.T. Specialty "continued to exchange letters, mostly focusing on Plaintiff's damages" over the course of another four months without any mention of litigation, until they "trailed off and no further settlement communications took place."  (Pl.'s Mem. Supp. at 6–7; *see also* Hutchinson Decl. Ex. D [Doc. No. 28-4].)  But the fact that the parties were discussing possible resolution is not incompatible with a finding that the prospect of

litigation had already arisen. Indeed, many cases are resolved even *after* litigation is filed, as the parties each gather information that leads them to reevaluate their positions.

Accordingly, the Court concludes that as of November 17, 2016, the prospect of litigation had arisen to a sufficient degree to trigger the applicability of the work product doctrine on and after that date. Any otherwise responsive documents generated *prior* to that date that were withheld on work product grounds must be produced no later than January 10, 2020.

As for documents generated on and after November 17, 2016, however, the analysis is not yet complete. The Court must also look at the second prong of the work product analysis: whether such documents were primarily prepared *because of the prospect of litigation*, or for an ordinary business purpose. Documents prepared in the regular course of business are not protected even if "litigation is already in prospect." *Simon*, 816 F.2d at 401*; see also United Nat'l Ins. Co. v. Gunderson, Inc.*, No. CV 08-678 (MJD/JJK), 2010 WL 11537511, at *3 (D. Minn. May 20, 2010) (according work product immunity to an insurer only if it can "itemize" the documents it withheld, "summarize" their contents, or "explain the specific factual basis for its claim of work-product protection for individual documents"); *Ispat Inland, Inc. v. Kemper Envtl., Ltd.*, No. CIV 06-60 PAM/JSM, 2007 WL 737786, at *3 (D. Minn. Mar. 8, 2007); *Soyring v. Fehr*, Civ. No. 05-1900 (ADM/RLE), 2006 WL 8443343, at *4 (D. Minn. Feb. 23, 2006). The Court therefore turns to the three categories of documents sought by S.T. Specialty with this question in mind.

## A. Copesan's Documents Listed on its Privilege Log

As to the documents on Copersan's privilege log dated prior to November 17, 2016, the Court has held they must be produced. However, as to the more than 150 documents withheld on work product grounds that were identified on the privilege log as having been generated on or after November 17, 2016, and prior to April 27, 2017,[6] the Court finds that it has inadequate information about the nature of the documents to make an informed assessment as to whether each was prepared because of the prospect of litigation.

Accordingly, the Court will conduct an *in camera* review of a representative sample of those documents, selected by S.T. Specialty. To that end,

- No later than January 17, 2020, counsel for S.T. Specialty must e-file a letter identifying no more than 35 entries from among the documents on the log dated between November 17, 2016, and April 26, 2017, for the Court to review *in camera.*

- No later than January 24, 2020, Copesan must deliver to chambers a three-ringed binder containing those documents, with each tabbed by reference to its entry on the privilege log. Copesan may, within reason, also include

---

[6] As the Court previously noted, *supra* at fn. 4, Copesan has now served an updated and supplemented privilege log. If the additional information contained in the updated log raises *new* questions concerning whether particular documents generated *after* April 27, 2017, were in fact generated because of the prospect of litigation rather than for an ordinary business purpose, S.T. Specialty may file a motion seeking an *in camera* review of those particular documents. With regard to Copesan's claims of attorney-client privilege, the instant motion did not challenge those claims except insofar as it sought additional details, and therefore the Court does not comment on them.

behind each such tab, segregated by a slip page, any other documents it

contends are necessary to understand the context of the documents the

Court will be reviewing.

Based on the Court's review of the sample of documents, it will issue a final order

regarding whether those and other documents in that date range on the privilege log must

be produced or whether it will uphold Copesan's work product objections to some or all

of them.[7] S.T. Specialty has not argued that it has a substantial need for the documents

that would override the protection for ordinary (as opposed to attorney) work product;

therefore, the Court's decision regarding whether the documents were generated

primarily because of the anticipation of litigation should dispose of the issues raised as to

those documents.

### B.        The Subpoenas to Kessler and Sedgwick

Having concluded that documents prior to November 17, 2016, are not entitled to

work product protection, any responsive and otherwise discoverable documents and

redacted portions of documents in Kessler's and Sedgwick's files that were generated

prior to that date and withheld on attorney work product grounds must also be produced

no later than January 10, 2020.

As to documents in Kessler's and Sedgwick's files dated on or after November 17,

2016, the Court has found that they were generated after the prospect of litigation arose.

---

[7]     The Court also reserves the right to revisit its conclusion as to the date on which
Copesan anticipated litigation if the documents reviewed *in camera* clearly point to a
different conclusion from that reached by the Court on the basis of the existing record.

Here, however, the Court must address two procedural matters pertaining to the subpoenas. On the one hand, Copesan argues the subpoenas were invalid because S.T. Specialty failed to serve them on Copesan's counsel prior to serving them on Sedgwick, Kessler, and Haase, as required by Federal Rule of Civil Procedure 45(a)(4). On the other, S.T. Specialty argues that Copesan's work product objections should be dismissed in their entirety because it had no standing to object to subpoenas served on others, and those others did not object for themselves.

As to the issue of advance notice of the subpoenas, while Copesan is correct about the requirements of Rule 45(a)(4), Copesan has not identified any specific prejudice resulting from the alleged lack of notice, and the Court is not aware of any authority suggesting that a subpoena is automatically rendered unenforceable if the party serving the subpoena fails to comply with Rule 45(a)(4). Moreover, as to the Sedgwick subpoena, given the confusion in the record about the date of service (*see* fn. 2 *supra*), it is not clear to the Court that it was *not* served on Copesan's counsel before it was formally served on Sedgwick. Thus, in the circumstances here, the Court does not find the subpoenas to be unenforceable because of any failure by S.T. Specialty to give notice of the subpoenas to Copesan's counsel in advance.

As for the issue of standing to object, there can be no doubt that Copesan has at least as much interest, if not more, in claiming work product protection for documents in the hands of the insurer and those retained by its insurer to assist in its defense. *Cf.* Rule 26(b)(3)(A) ("[A] party may not discover documents…that are prepared in anticipation of litigation…by or for another party or its representative (including the other party's . . .

insurer.").  Furthermore, given that Sedgwick, Kessler, and Haase were working on Copesan's behalf in this matter, to argue that they should have interposed separate objections seems to elevate form over substance.  The Court also notes that S.T. Specialty did not move to enforce the subpoenas directly against Kessler or Sedgwick, but only against Copesan.  So the Court is not inclined to find the work product protection or attorney-client privilege waived because Copesan rather than its insurance claim adjusters issued the objections, particularly where the protections being asserted – work product and privilege – were Copesan's.

That said, the Court is troubled that neither Kessler nor Sedgwick (nor Copesan acting on their behalf) produced a log of the documents withheld until six weeks after the hearing on this motion (and months after the subpoenas were served).  In that respect, Copesan seems to be trying to have it both ways—seeking full recognition of its objections, but not fulfilling the responsibility imposed on any producing party, including a subpoena recipient, to "describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim."  Fed. R. Civ. P. 45(e)(2)(A)(ii).  S.T. Specialty was entitled to that.

In these particular circumstances, however, the Court will exercise its discretion to find that the attorney-client privilege and work product protection were not waived.  *Cf. Cargill, Inc. v. Ron Burge Trucking, Inc.*, 284 F.R.D. 421, 425 (D. Minn. 2012) (noting the Court's broad discretion in this area).  Given the almost certain significant overlap between the documents identified in the Copesan log and the documents withheld by

Kessler and Sedgwick, the Court does not believe that S.T. Specialty was prejudiced in advancing this motion by the late production of those logs.

The Court will, however, allow S.T. Specialty to identify 15 additional documents (total) from among the documents listed on the Kessler and Sedgwick logs during the period November 17, 2016 through April 26, 2017, for the Court's *in camera* review.[8] It must identify those in the same letter to be e-filed on or before January 17, 2020, and Copesan must produce them for review in the form described above on or before January 24, 2020.

### C.    Copesan's Consulting Expert

S.T. Specialty also seeks to enforce its subpoena seeking documents from Ryan Haase, the engineering consultant hired by Sedgwick. Copesan argues the subpoena called for documents that are protected from discovery under Federal Rule of Civil Procedure 26(b)(4)(D), which reads:

> Ordinarily, a party may not, by interrogatories or deposition, discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial.

S.T. Specialty argues that Haase was not originally retained in anticipation of litigation, but rather to conduct an insurance claim investigation, so any work he did that predated his status as a consulting expert is discoverable.[9] Copesan disagrees, arguing

---

[8]    As already noted with regard to Copesan's documents, S.T. Specialty has not argued that it has a substantial need for these documents that would override the protection afforded ordinary work product.

[9]    S.T. Specialty does not dispute that at some point Haase did assume the role of a consulting expert retained in anticipation of litigation.

that Haase has been a consulting expert in anticipation of litigation from the moment he was hired.

Rule 26(b)(4)(B) mirrors the language of 26(b)(3)(A), offering the same degree of protection for consulting experts as for work product. "[The phrase 'in anticipation of litigation,'] which appears in identical form in two subsections of Rule 26(b), is best interpreted as sharing the same meaning." *QBE Ins. Co. v. Interstate Fire & Safety Equip. Co.*, No. 07-1883, 2011 WL 692982, at *5 (D. Conn. Feb. 18, 2011)). Both subsections contemplate the key distinction in this case: Preparation for litigation is generally not discoverable, whereas work produced in the ordinary course of business is. "To conclude that an expert was hired in anticipation of litigation, a lawsuit need not have been filed, but there must have existed more than a remote possibility of litigation." *Spearman Indus., Inc. v. St. Paul Fire & Marine Ins. Co.,* 128 F.Supp.2d 1148, 1151 (N.D. Ill. 2001).

For the reasons already discussed, the Court has concluded that the prospect of litigation arose as of November 17, 2016, when S.T. Specialty wrote a detailed letter to Copesan notifying it of S.T. Specialty's position that Copesan's choice of fumigant and failure to warn and protect caused over $500,000 in damages and losses. There is no question that Haase was retained after that date, and no evidence that he was retained for any purpose other than to investigate S.T. Specialty's claims that the fumigant caused the damage to its equipment. As Haase has not, to date, been identified as an expert who will be called at trial, the facts learned by him and the opinions formed by him are not discoverable unless S.T. Specialty can show "exceptional circumstances under which it is

impracticable for [S.T. Specialty] to obtain facts or opinions on the same subject by other means." Fed. R. Civ. P. 26(b)(4)(D)(ii). S.T. Specialty has not made such a showing. On the contrary, S.T. Specialty had first access and continuing access to the damaged equipment, and it is Copesan who complains that by the time its expert arrived on the scene, some of the equipment was no longer available to inspect. Therefore, the Court cannot conceive of any respect in which Haase may have facts or opinions on any subject on which it was impracticable for S.T. Specialty to gather facts or opinions for itself. The Court concludes that the facts known to and opinions developed by Haase are not discoverable under Rule 26(b)(4)(D), and therefore denies S.T. Specialty's motion to compel as to Haase. In addition, since the Court finds Haase's work to be protected in its entirety, the Court will not require Haase (or Copesan) to produce a log of his files.

Accordingly, **IT IS HEREBY ORDERED** that Plaintiff S.T. Specialty's Motion to Compel [Doc. No. 25] is **GRANTED IN PART AND DENIED IN PART**, as set forth fully herein.

1. On or before **January 10, 2020**, all responsive documents that were created prior to November 17, 2016, and withheld by Copesan, Kessler, or Sedgwick on the basis of the work product protection must be produced to S.T. Specialty.

2. On or before **January 17, 2020**, S.T. Specialty must e-file a letter identifying

    a. No more than 35 entries dated between November 17, 2016, and April 26, 2017, from among the documents on the Copesan privilege log for the Court to review *in camera*; and

    b. No more than 15 additional entries dated between November 17, 2016, and April 26, 2017, from among the documents on the Kessler and Sedgwick privilege logs for the Court to review *in camera*.

3. On or before **January 24, 2020**, Copesan must deliver to chambers a three-ringed binder containing the documents identified by S.T. Specialty, with each

tabbed by reference to its entry on the privilege log.  Copesan may, within reason, also include behind each such tab, segregated by a slip page, any other documents it contends are necessary to understand the context of the documents the Court will be reviewing

4.  Based on the Court's review of the sample of documents, it will issue a final order regarding whether those and other documents in that date range on the privilege log must be produced or whether it will uphold Copesan's work product objections to some or all of them.

5.  S.T. Specialty's motion to compel documents from Ryan Haase is **DENIED**.

Dated: January 2, 2020         _s/ *Hildy Bowbeer*_____
                          HILDY BOWBEER
                          United States Magistrate Judge